## SUPREME COURT.

### JAMES W. RICHARDSON agt. PETER B. CRANDALL.

The plaintiff's assignor was a *bounty broker*, and on the 30th January, 1865, presented a number of men at the office of the defendant—who was provost marshal, for enlistment, who stated that they had engaged to go into the service of the United States for a bounty of $50 each. They were informed that the county was then paying a bounty of $700 for each man, and that they were held by no contract to enlist for any less sum, and that that amount should be secured to them; but they all persisted in stating that they had agreed to go for $50, and that they were satisfied with that sum, and upon this they were mustered in, and $50 only paid to each.

Under these circumstances, and to guard against apprehended desertion, the defendant required the plaintiff's assignor to give *bonds of indemnity*, as security that the men offered for enlistment should not desert the service before reaching the rendezvous. Accordingly the plaintiff's assignor gave such bonds—twenty-two in number, and deposited the same with the defendant. The men were thereupon mustered and sworn in, and of the number twenty-four deserted before reaching the rendezvous, and were not received, but escaped on the way:

*Held,* that an action by the plaintiff (the claim having been assigned to him by the broker) against the defendant, alleging an unlawful detention of the *bonds* by the defendant, claiming a restoration, and damages for the detention, could not be maintained.

*First.* It could not be maintained on the ground that the *agreement* was void as against *public policy*, assuming that it was made without any special authority of law; because, in addition to the unequivocal indications of bad faith on the part of the men presented for enlistment, the defendant had good grounds for questioning the good faith of the party presenting them, and who was in some sense responsible for their good conduct. The act of requiring indemnity, therefore, was not only not within any inhibition on the score of public policy, but was entirely justifiable by the circumstances, if not one eminently meritorious.

*Second.* It could not be maintained on the ground that the act of the defendant in receiving these bonds comes under condemnation as an act done by *color of office,* and therefore void, because the class of cases embraced under this head are those which are defined by the statutes of this state, and are intended to apply to those holding office under the state authority. The act of the defendant in taking the bonds, does not come within any statutory prohibition of a

Richardson agt. Crandall.

thing done by color of office, nor within any definition of it regarded as an offence against law or morals. Where an agreement does not provide for an indemnity to the officer for a breach of duty, and is not condemned by either the common or statute law, it cannot be held void as taken *colore officii.*

*Third.* The action cannot be maintained, because the *agreement was executed.* Whatever parties to an action have executed either for fraudulent or illegal purposes, the law refuses its aid to enable either party to disturb. An unlawful *executory contract* the law will not enforce. An unlawful *executed contract*, it will not rescind, nor restore whatever has actually passed under and in performance of it. In both cases it leaves the parties where it finds them. And in the case of an executed contract, where the parties are in *pari delicto,* the condition of the defendant is always preferred, and he shall be allowed to prevail. And one of the parties being a *public officer* and the other not, does not alter the application of the principle of *pari delicto.*

*Fourth.* There is no force in the objections that the agreement is void for *want of consideration,* and also by the *statute of frauds,* as being a contract to answer for the default of a third party, and not in writing. The action is not brought upon the *agreement.* After a party has voluntarily performed an agreement, it is too late for him to urge these objections.

*Oneida Circuit and Special Term, November,* 1865.
*Before* BACON, *Justice.*
TRIAL by the court.

COCHRANE, *for plaintiff.*
HUNT, *for defendant.*

BACON, J. In examining this case I have confined my attention to the matters of fact set forth in the stipulation executed by the attorneys for the respective parties, with the exception of the single fact testified to by the defendant, that he reported his official action in the premises to his official superior in the government. The other matters testified to were received conditionally, and as I do not perceive that they have any special materiality, and were, perhaps, in strictness, incompetent as matters of evidence, I reject and exclude them from the case. The fact of the communication of the defendant to the government authorities of his action in the matter of receiving the bonds, is not in itself very material. It only goes to characterize the motive by which he was controlled in the transaction, to wit: the protection of the public authorities from an

apprehended fraud and loss, and as the transaction was not dissented from, it may be assumed that it had the sanction and approbation of the government, if that shall be deemed essential or important.

The facts which are set forth in the stipulation, and which are found .by the court, present substantially the following case :   The plaintiff's assignor was a bounty broker, who was engaged in furnishing and presenting recruits for enlistment on behalf of certain localities, under the call of the president, in December, 1864.   The defendant was the provost marshal at the time in question for the twenty-first congressional district of New York, and engaged in the enlistment and mustering in of men under the call, at Utica, and forwarding them to the general rendezvous at Elmira.   On the 30th of January, 1865, a number of men were presented at the office of the defendant by said Aaron Richardson, for enlistment into the service, who stated that they had agreed to go for a bounty of $50 each.   At this time the county of Oneida was paying a bounty of $700 per man, and this fact was stated to the said recruits, and they were informed they were held by no contract to enlist for any less sum, and that that amount should be secured to them.   They all persisted in stating that they had agreed to go for $50, and that they were satisfied with that sum, and upon this they were mustered in, and $50 only was paid on their behalf.   Under these circumstances, and to guard against apprehended desertion, the defendant required that an indemnity against this contingency should be furnished by Richardson, and he accordingly agreed to, and did forthwith deposit and leave with the defendant the twenty-two bonds which it is the object of this suit to reclaim, as a security that the men thus offered for enlistment, should, after being mustered and sworn into the service, go forward and be received at the designated rendezvous, or in other words, should not desert the service before reaching the rendezvous.   They were

accordingly mustered and sworn in, and of the number twenty-four did desert before reaching the rendezvous, and were not received, but escaped on the way. The transaction was thus consummated and closed, and the condition on which the bonds were deposited having failed of performance, the defendant retained them in fulfillment of the agreement. Richardson assigned his claim to the plaintiff in this suit, and the action is brought by him, alleging an unlawful detention of the bonds by the defendant, claiming a restoration and damages for the detention.

The argument of the plaintiff's counsel, which was ingenious and forcible, was presented in various aspects; but it resolves itself substantially into this: that the agreement under which the deposit was made was void, as against public policy; that it was made by an officer in excess of and without authority of law; that its tendency was to invite and encourage a want of vigilance on the part of the officers of the United States, and to shift the duty and responsibility of such officers upon private citizens and irresponsible parties. There were some other objections interposed to the defence, which I shall notice before I conclude, but the main argument rests upon these propositions.

Is it true, then, that the agreement was void, as one against public policy, assuming, as we may, that it was one made without any special authority of law? Let us see what was the nature of the transaction, and how the parties stood in relation to it and the public. Here were a number of men presented for enlistment by Richardson, under circumstances which excited the most natural and grave suspicions that a fraud was intended. All parties were advised that a very large bounty was offered, and ready to be paid to each of them, and that there was nothing to prevent their acceptance. They persisted in saying that they were satisfied with the $50 that Richardson had contracted to pay them, and utterly refused the

ample compensation tendered to and pressed upon them. Now whatever may be said, and too much can hardly be said of the elevated patriotism of the men who at the first outbreak of the rebellion, rallied to the defence of the country " without money and without price," it is due to the truth of history to add, that at the period in question, such self-sacrificing devotion was very rare, even if it were not quite unknown. Under the stimulus of high and extravagant bounties, the selfish and mercenary spirit had crept in and usurped the higher call of duty, and, therefore, when men thus presented themselves, pretending satisfaction in a sum insignificant in comparison with that offered to their acceptance, it was a most natural conclusion that a fraud of some kind was meditated, and that they never really designed to enter the service. Such was the belief of the provost marshal, and it would only be giving Richardson credit for ordinary shrewdness, to conclude that he entertained the same suspicion, even if he did not contemplate the result. The defendant was anxious to protect the public interest, and demanded the indemnity which Richardson was ready to give, and doubtless, in view of the actual and prospective profits of the business in which he was engaged, he could well afford to give.

Now in all this, I am unable to see what principle of public policy or of private morality is violated, or what dereliction of duty on the part of defendant, or of any one connected with, or responsible to him, it invites or implies. The general duty of the provost marshal, as I understand it, was to muster and receive recruits into the service of the government, and forward them to any rendezvous which the war department should designate. No orders of the department have been given in evidence in this case, and none exist that I am aware of, prescribing the duties of the provost marshal here in respect to deserters, and he had none imposed upon him by the enrolling act, except to obey such orders in regard to deserters, as should from time to

Richardson agt. Crandall.

time be given to him through the medium of lists furnished to him by the provost marshal general. Here were a set of men who contemplated a fraud upon the government, as their subsequent conduct incontestably proves. In addition to ordinary prudential means of protection, was it a violation of any principle of public policy, was it a corrupt usurpation of power, and a prostitution of his office, for the defendant to require an indemnity, which to some extent would circumvent this fraud? It was a case extraordinary in its aspects, and exciting a well founded suspicion (justified by the result), and demanded some unusual measures to counteract the intention obviously manifested. It will hardly be claimed that the defendant was called upon to put the men in irons, or surround them with a guard equal in number to themselves, to insure their safe transit. The result would be to divert from the field a force equivalent to that in it, to compel the service of men predetermined to desert their flag. The right to declare a contract void, as against public policy, does not rest on any such vague ground as this, but can only properly be exercised in a clear case, and where a dereliction of duty is palpable, or the violation of a principle is well defined; and surely it cannot be affirmed that this is such a case. In addition to the unequivocal indications of bad faith on the part of the men presented for enlistment, the defendant had, in my judgment, good grounds for questioning the good faith of the party presenting them, and who was in some sense responsible for their good conduct. The act of requiring indemnity, therefore, was not only not within any inhibition on the score of public policy, but was entirely justified by the circumstances, if, indeed, it should not rather be characterized as one eminently meritorious.

The act of the defendant in receiving these bonds, does not come under condemnation as an act done by color of office, and therefore void. The class of cases embraced under this head are those which are defined by the statutes

of this state, and are intended to apply to those holding office under the state authority. The statute (2 *R. S.* 296, § 59, *last edition,*) prohibits a sheriff or "other officer" from taking any bond, obligation or security, by color of his office, in any other case or manner than as provided by law. And in *Webb* agt. *Alderton* (4 *Barb.* 52), the court says that "other officers," included in this prohibition, are "coroners, constables, and others of that description, whose duties in many respects are similar to those of sheriffs, and who are equally exposed to temptation to grant favors." It is added, in the same connection, that "this provision of law is not of universal application to all classes and descriptions of public officers, nor to all bonds and securities which they may happen to take, without authority of a statute for that purpose." This may be well illustrated by the familiar case of *The State* agt. *City of Buffalo* (2 *Hill,* 434), where an officer of the state, who had not the slightest authority of law, loaned the arms of the state, and took a bond for their safe return. It was held that a suit would lie upon the bond, and it was enforced accordingly. The loan, the court say, might be regarded simply in the light of an excess of authority, rather than a criminal and corrupt violation of law, and the transaction could not be regarded as belonging to that species of illegality which would avoid the contract, and prevent the state from recovering upon it.

The act of the defendant in taking the bonds, does not come within any statutory prohibition of a thing done by color of office, nor within any definition of it, regarded as an offence against law or morals. The essence of the act lies in the motive, and necessarily implies corruption or the expectation of private gain, and neither of these can be affirmed of the conduct of the defendant. Color of office is defined to be "where an act is evilly done by the countenance of an officer, and is always taken in the worst sense, being grounded upon corruption, to which the office

is a mere shadow or color." This definition is cited and approved in *Decker* agt. *Judson* (16 *N. Y.* 440), and the court in that case say, that it does not follow that a security taken by a public officer is unlawful, because it is not expressly authorized by statute, for many securities taken by public officers have been upheld, if valid at common law. Where an agreement does not provide for an indemnity to the officer for a breach of duty, and is not condemned by either the common or statute law, it cannot, says Chancellor WALWORTH (23 *Wend.* 647), be held void as taken *colore officii.*

I have thus far treated this case as if it were an action brought to enforce the contract by one of the parties, who comes into court either to complain of its violation, and who seeks redress under and by virtue of its provisions, or who asks to have it enforced while it yet remains unperfected and executory. If the defendant had refused to muster in the men after Richardson had deposited the bonds, and the action was to compel him to perform that part of the agreement, or if after the men had been mustered in, Richardson had refused, pursuant to his contract, to deposit the bonds, and the action was to compel his performance, the argument would, on the assumption that the agreement was void as against public policy, have great force and relevancy. But this is quite another case, and all that the plaintiff's counsel urges to show that the contract is one that the law utterly condemns, may be fully granted, and yet the plaintiff cannot come into court and ask relief. And this upon the principle almost as old as the common law, that whatever parties to an action have executed, either for fraudulent or illegal purposes, the law refuses its aid to enable either party to disturb. This distinction between executed and executory contracts has always existed, and with some exceptions, standing upon principles peculiar to the cases, has been uniformly maintained. An unlawful executory contract the law will not

enforce—an unlawful executed contract it will not rescind, nor restore whatever has actually passed under and in performance of it. In both cases it leaves the parties where it finds them. The rule is well stated by *Comyns* in his treatise on contracts (2 *Com. Con.* 109), as follows: "Where money has been paid on an illegal contract, it is a general rule that if the contract be executed, and both parties are in *pari delicto*, neither of them can recover from the other the money so paid; but if the contract continues executory, and the party paying be desirous of rescinding, he may do so, and recover back his deposit by an action of *indebitatus assumpsit*, for money had and received." In relation to contracts which are against public policy, or which involve moral turpitude, the rule forbidding relief is absolute, but when the contract has respect to that which is *malum prohibitum*, it must be stated with some qualifications. Lord MANSFIELD, as early as 1781, in the case of *Smith* agt. *Bromley*, which is reported in a note in *Doug.* 696, alludes to this distinction, and upon it the decision in this case rested. "If the act," he says, "is in itself immoral, or a violation of the general laws of public policy, then the party paying or performing shall not have this action, for when both parties are equally criminal against such general laws, the rule is *potior est conditio defendentis*." But there are other laws, he adds, which are intended to protect the subject against oppression and fraud, and if they are violated, and the defendant takes advantage of the plaintiff's position, then the plaintiff shall be allowed to recover; and it was upon that ground that the plaintiff prevailed in that case. The right to recover back what has been paid or delivered upon a usurious contract, rests upon the same principle. The law regards whatever is done to obtain money on usurious terms not as a voluntary act, but as the result of constraint on the part of the usurer. "The borrower on such terms is the slave of the lender; nay, more, a slave in chains, and utterly incapable

of resistance." *Per* BEARDSLEY, *J.*, *Schroeppel* agt. *Corning* (5 *Denio*, 240). The same principle declared by Lord MANSFIELD, was applied by Lord KENYON in *Howson* agt. *Hancock* (8 *Term Rep.* 575), to the case of an action by the loser in an illegal wager, to recover of the winner the money which had been paid over to him by the stakeholder, with the consent of the loser. There is no case, said Lord KENYON, to be found where money has been actually paid by one of the parties to the other upon an illegal contract, both being participants, that an action has been maintained to recover it back again.

These principles have been often alluded to and ruled in our own courts, and it may be stated as a proposition without exception, that in the case of an executed contract where the parties are in *pari delicto*, the condition of the defendant is always preferred, and he shall be allowed to prevail. (*See among other cases, Nellis* agt. *Clark*, 4 *Hill*, 424 ; *Dix* agt. *Van Wyck*, 2 *Hill*, 522 ; *Burt* agt. *Place*, 6 *Cow.* 431; *Daimouth* agt. *Bennett*, 15 *Barb.* 541.) In this case it was decided that money paid for the purpose of compounding a prosecution for a supposed felony, could not be recovered back by the party paying it, and that if a contract be evil in itself, or involving moral turpitude, money paid upon such a contract cannot be reclaimed at law or in equity *Pepper* agt. *Haight* (2 *Barb.* 429); *Staples* agt. *Gould* (5 *Seld.* 520), where it is held that money deposited with a stock broker for an unlawful purpose could not be recovered back.

The only difficulty there has ever been in applying the rule is, to determine when the parties can be said not to be in *pari delicto*, so that the less guilty (if there be degrees in the dereliction) can claim relief. The only rule I can find having any authority to support it, is that already alluded to, to wit : that if the contract respects something prohibited by statute, and a penalty is imposed upon one party and not the other, then the party not subject to the

penalty may recover, for in this respect he is regarded as
less criminal than the other.    This is the principle declared
by Lord MANSFIELD in *Browning* agt. *Morris* (*Cowp*. 796),
where he says, that " where contracts and transactions are
prohibited by positive statutes, for the sake of protecting
one set of men from another set of men, there the parties
are not in *pari delicto*, and in furtherance of these statutes
the person injured after the transaction is finished, may
bring his action to defeat the contract."    " It is very mate-
rial," he adds, " that the statute itself, by the distinction
it makes, has marked the criminal, for the penalties are all
on one side."

The principle of this decision has been generally con-
curred in by the courts in this country and in this state,
followed and affirmed by the court of appeals in *Tracy* agt.
*Tallmadge* (4 *Kern*. 162).  It is briefly and forcibly expressed
by Judge SELDEN, when he says, " the cases in which the
courts will give relief to one of the parties on the ground
that he is not in *pari delicto*, form an independent class,
entirely distinct from those cases which rest on a disaffirm-
ance of the contract before it is executed.    It is essential
to both classes that the contract be merely *malum prohibi-
tum*.    If *malum in se*, the courts will in no case interfere
to release either party from any of its consequences."  (*See
also to the same effect, and affirming the same principle, Inhab-
itants of Worcester* agt. *Eaton*, 11 *Mass*. 368 ; *White* agt.
*Franklin Bank*, 22 *Pick*. 181.)

It is almost superfluous to remark that the defendant in
this case is in no sense whatever within the scope of this
principle.    His act was subject to no statutory prohibition;
he violated no positive law of the general or the state
government, and no penalty of any description is denounced
against him for doing that of which the plaintiff complains.
If falling under any condemnation (as I have endeavored
to show it does not), it was an offence against some rule
of public policy, which it is alleged it violated.  If so,

Richardson agt. Crandall.

both parties were actors; the degree of dereliction it might be difficult to discriminate, and if it could, that would not help the plaintiff, for the contract being executed, the law will not relieve him from the position in which he has voluntarily placed himself.

I do not deem it necessary to spend any time upon the case of *Webb* agt. *Albertson* (4 *Barb.* 51), which was the leading and almost the only authority quoted on the argument to sustain the position of the plaintiff's counsel. The action in that case was by the commissioners of highways of a town to recover upon a bond given to them as such by certain individuals, covenanting to open and extend a highway without expense to the town. It was held that they could not recover, for the reason that the commissioners had no authority to take such a bond, and that the general policy of the law forbid the transaction. I will not stop to inquire whether, under the principle of recent decisions, by which acts of corporations and *quasi* corporations have been upheld, where the only objection was that they were *ultra vires*, this decision would now be sustained. It is enough to say that the action was one which sought to enforce a liability upon the bond, and where the contract had not been performed, but remained executory, and coming, therefore, within the principle in which, in cases of that nature, the courts have refused to interfere.

To escape the application of the principle that where the parties stand in the same *delictum*, the courts will not interpose, the counsel for the plaintiff claims that inasmuch as the defendant was a public officer, the parties are not for that reason in *pari delicto*. Only two authorities are cited to sustain this position, viz : *People* agt. *Whaley* (6 *Cow.* 661), and *Chappel* agt. *Poles* (2 *M. & W.* 867). It is enough to say of the first case, that it was an indictment against the defendant as a justice of the peace for extortion, and has of course no bearing upon the question involved here. There is no doubt that civil actions as well

as criminal prosecutions, may be maintained against officers who under color, and by the assumed powers of their offices, exact illegal fees, or take bribes for the performance of official duty, and they stand upon the plain grounds either of being violations of positive enactments, or as acts of oppression exercised upon victims, reluctant but incapable of resistance. The case of *Chappell* agt. *Poles*, was an action against parish officers to recover the balance of money paid to them by the putative father of an illegitimate child which had died, while but a small part had been expended in its support. The plaintiff recovered on the ground that the money was paid upon a consideration which having to the extent of the unexpended balance, failed, that portion could be recovered back, or, to use the words of Lord ABINGER, "the death of the child left the other money in their hands, which, at all events, they ought to have repaid the father, after the object of the payment by him had been exhausted." This is putting the case upon a very simple and obvious ground, and the decision cannot fairly be cited as authority for anything beyond this. It is not put upon the footing that the defendants were public officers, and for that reason occupied a less favorable position than the plaintiff. Nor can any such proposition, I am persuaded, be successfully maintained in this case.

The counsel for the plaintiff urges that the agreement in this case is void for want of consideration, and also by the statute of frauds, as being a contract to answer for the default of a third party, and not manifested by writing. The obvious answer to these suggestions is, that this is not an action upon the agreement—if it was, there might be force in the objection. But after a party has voluntarily performed an agreement, it is too late for him to urge either that it was not attended by these formal solemnities to a perfect execution which the law requires, or was not upheld by a sufficient consideration. The party waived all these, even if he might originally have insisted upon them, by

doing the thing which he had contracted to do; and his *locus penitentiæ*, if he ever had any, has long since passed.

It was claimed that the defence which is interposed in this case, is inadmissible under the pleadings, and the facts embraced in the stipulation could only be given in evidence under an answer specially setting them forth. I do not apprehend there is any difficulty on this point. The answer is a general denial of the allegations of the complaint, and the complaint avers that the defendant became possessed of the bonds in question, and unlawfully withholds them from the plaintiff. This is a substantive allegation essential to the right of recovery, and the answer takes issue on this. The facts proved at the trial show, as I have endeavored to establish, that the defendant came rightfully by the possession of the bonds, and that he lawfully retains them. If so, his defence is perfect, and he needs no other shield than the general issue. But if it were otherwise, there would be no difficulty in allowing the defendant's pleading to be conformed to the facts proved, and this may be done now or at any time before judgment.

Having arrived at these conclusions, there is nothing to add but to direct that a judgment dismissing the complaint, with costs, and ordering a restitution of the bonds, be entered; but as the amount involved is large, and the plaintiff will doubtless desire to review the case on appeal, I grant an order staying all proceedings for twenty days, to enable the plaintiff to prepare a case with exceptions, and if prepared and served within that time, staying all further proceedings until the argument and decision of the exceptions.